Albina Charbonneau, Appellant, v. Wray S. Norton, Appellee.

Gen. No. 35,140.

McSurely, J., dissenting.

Opinion filed November 9, 1931.

Welch & Hoffman, for appellant.

Babcock, Worthy & Gilruth, for appellee; Charles H. Chapman, of counsel.

Mr. Justice Matchett delivered the opinion of the court.

In an action on contract for money claimed to be due for the support, maintenance and education of defendant's infant children, Dorothy Norton and Helen Wray Norton, there was a trial by the court, a finding for plaintiff in the sum of $125, with judgment thereon, from which plaintiff has perfected this appeal, claiming that she is entitled to a judgment for a larger amount.

The undisputed evidence tends to show that plaintiff did support, maintain and educate these infant children, who were respectively two and ten years of age at the time she received them, from March 1, 1924, until July 15, 1925.

By way of defense the affidavit of merits averred that defendant demanded the custody of the children and advised plaintiff that he would not pay for the maintenance and support of the children at her home; that plaintiff refused to give up the children to him, although he often demanded the custody of them; that

after that time the children were held under the dominion of plaintiff against defendant's will; that he was therefore not liable.

The material facts appear to be as follows: Defendant and Mary Louise Norton were married January 13, 1912, and Dorothy and Helen Wray were the only children born of that marriage. Dorothy was born September 9, 1914, and Helen January 29, 1922. Defendant ceased to live with his wife as her husband in 1921, and did not thereafter live with her. She died March 10, 1924. Prior to her death, and on or about July 31, 1923, she filed a bill for divorce in the circuit court of Cook county, Illinois, averring desertion, praying for a divorce, etc. Defendant was served by publication. December 6, 1923, a decree of divorce was entered in the case which awarded the care and custody of these minor children to their mother, Mary Louise Norton. Ten days prior to her death and on the day she was taken to the hospital, she gave these two infant children into the custody of her sister, the plaintiff in this case. Plaintiff worked for a salary in a store and employed her mother, the grandmother of the children, to care for them in her absence. They were sent to school and were clothed at plaintiff's expense.

Defendant says that he visited the children during the period from March 1, 1924, to July 15, 1925, about 15 to 20 times; that the children did not appear to be clothed to his satisfaction, but that he did not complain about that and he did not refuse to permit them to live there by taking them away; that he is a stock and bond broker earning from $300 to $400 a month. He testifies that after the death of the mother in the early part of May, 1924, when it first came to his knowledge that the children were with plaintiff, he went to plaintiff's home and had a conversation with her in the presence of John J. Hickey, Mrs. Charbonneau, Mrs. Chalifoux, Mrs. Bennett and his daughters; that he told plaintiff

he wanted to take the children home; that she replied nobody was going to take the children and that the mother had willed them to her; that he stated that was "quite foolish," that it was not possible to will children. Defendant's testimony is further: "She (plaintiff) said, 'You are not going to take these children; she willed them to me and I am going to keep them.' I (defendant) said, 'I want to take these children home and take care of them, that is what I came here for.' She said, 'You will not take them out of here. You abused and were mean to my sister, and I am not going to allow them to go.' I said, 'You and I have no quarrel. If that is the way you feel about it, I probably will have to take some further steps.' I spoke to the children about not to be afraid."

Defendant says he went back to plaintiff's home in the middle of the same week and had a conversation with plaintiff when no one else was present; that he told her he wanted to take the children home, and he had refused for three consecutive years to support the children "in the conditions in which they should not be," as he saw it; that plaintiff said, "they are willed to me and I am going to keep them." Defendant says that at the time he spoke of a previous situation he had relative to the children; that the governor of Indiana would not permit him to be extradited because of the conditions in which the children were being kept and because he refused to support them in those conditions.

Defendant further testified that he afterwards returned several times, and some time after September he told plaintiff that he came to get the children and that she did not have the equipment to take care of them; that then for the first time she told him that she wanted money for the care of the children, and that he again said to her that he would not support the children there when they were being kept against his wishes; that she said she was going to keep them and

he was going to pay her for it, and if he paid her he could have them; that she followed him when he went on the porch and kept screaming, "Pay your debts and you can get your children."

These convèrsations and interviews are denied by plaintiff, Mrs. Charbonneau, who says that defendant never asked that she return the children and never asked about the condition of the children; that she saw him about June 10, 1925, and that she did not see him from that time until the children went with him in July; that as a matter of fact, while she was employed during the day he would come and get the children and promise them care; that she never stopped them from going with him; that as a matter of fact the children went with their father voluntarily when they left for defendant's home.

Dorothy testified that her father came to see her about six weeks after her mother's death and talked with plaintiff; that he said he came to get the children but that plaintiff said they were to stay with her; that defendant said to her in the presence of her aunt, "When you children are ready to come, let me know." She said her father came to see her after that time; that on one occasion he said he came to take the children and that her aunt wanted him to pay $125; that plaintiff did not say the exact amount of money she wanted but she wanted money for taking care of the children; that her father said he would not pay for it; that her aunt said the children were to stay with her, and "Dad asked me if I wanted to come, but I didn't say"; that her father afterwards came to the house in response to a telephone call from her, and at that time "We were all ready to go." They were then taken to the home of defendant's mother, 213 North Austin boulevard. When asked what caused her to pack up, Dorothy answered, "My aunt asked me if I would want to go live with my father. I left my aunt to go to my

father.'' She says that her wish to go to her father did not grow out of her own mind, but her aunt told her that if she wanted to go to her father she could do so. She says, ''I called my grandmother and my father came over.'' She further says that her father told her twice that whenever she wanted to live with him to let him know; that she was not forced to stay with her aunt; that her father gave her spending money when he came.

No propositions of law or of fact were submitted to the court, and we are left in some doubt as to the theory upon which the trial judge made the finding and entered the judgment shown by the record. The evidence submitted by plaintiff as to the value of the maintenance and service provided for these children is not disputed. It would seem that if defendant was to be held liable at all it should have been for a larger amount. However, the finding may have been based upon the theory that defendant was liable up to the time he made a demand for the children and that thereafter he was not liable. Defendant has cited a large number of authorities, all of which we think are quite easily distinguished upon the facts.

There is no doubt of the general rules of law applicable to such cases. The duty of a parent to support and maintain his own children is a primary and natural obligation which, fortunately, is usually fulfilled without resort to courts of law. When the father complies with that obligation, obviously he is not liable to any other person who has furnished support without his consent. Obviously also, in the first instance he has the right to determine the kind and character of support and maintenance which will be furnished, and no other person has any right to determine that question for him; nor is he obligated to pay for services and maintenance rendered by others to his children under such circumstances. However, where a parent

wholly fails and refuses to furnish necessary support to his infant child, the law will imply a promise on his part to reimburse anyone who renders support and maintenance. Defendant has cited a number of cases, such as *Witzmann v. Koerber,* 28 Ill. App. 174, and *Chilcott v. Trimble,* 13 Barb. 502, where it was held in substance that if a plaintiff who had stood *in loco parentis* to an infant desired to determine that relationship, he should tender the child or give notice of his intention; *Johnson v. Smallwood,* 88 Ill. 73, where the question at issue was whether a father was bound by the contract of an infant for necessaries, and it was held that under the circumstances appearing he was not; *Brush v. Blanchard,* 18 Ill. 46, where a stepfather who had received the son of his wife into the family, standing in the position of *loco parentis,* was held not liable to pay for the services of the minor; and *Thorp v. Bateman,* 37 Mich. 68, and *Fetrow v. Krause,* 61 Ill. App. 238, which announce the general rule that where the relationship between the minor and the person with whom he lives is that of *loco parentis,* the minor may not maintain suit for his services, nor may the person taking the place of the parent, or the estate of the person standing in such relationship, be held liable for support. *Hunt v. Thompson,* 4 Ill. (3 Scam.) 179, and *Schnuckle v. Bierman,* 89 Ill. 454, are also cited, but these cases announce the general rules which have heretofore been stated. On the other hand, plaintiff relies upon the rule as stated in 46 Corpus Juris 1262:

''It is a necessary consequence of the duty to support the child that the parent may, in a proper case, be held liable for necessaries furnished to the child by a third person, whether they are procured by the child or by the mother; and the mother has the same right as a stranger to recover from the father for necessaries furnished by her to the child, in the absence of any equitable reason for imposing on her the father's

primary obligation to support the child. On the other hand, it has been held that the mother cannot separate from her husband, take charge of the children, and maintain a suit against him for necessaries furnished them. In order to hold the parent liable there must be either an express promise to pay or circumstances from which a promise can be implied. Of course, where necessaries are furnished to a minor child with the parent's authority or under his express promise to pay therefor, the parent is liable; and a moral obligation to support the child is a sufficient consideration to sustain such promise, but not to sustain a promise to pay for necessaries already furnished.''

Plaintiff also relies on *Mullally v. Lott,* 162 Ill. App. 533, and there seems to be more similarity between the facts of that case and of this than any of the other cases cited. There the plaintiff sued to recover for board and clothing furnished defendant's wife and minor daughter. There was a finding in favor of plaintiff for the amount claimed to have been furnished to the daughter from January 1, 1908, to January 1, 1909, and against plaintiff for the board and clothing furnished the wife. Defendant sued out a writ of error, and plaintiff assigned cross-errors. Plaintiff was the grandfather of the minor daughter. As to the claim for the support of defendant's wife, it was urged that her rights had been adjudicated in a bill filed by her for separate maintenance. The court held, however, that the claim was not barred by that proceeding, but that the issues of fact as to whether the wife had been living separate and apart from her husband without good cause and against his consent had been heard by the trial court and decided in favor of defendant, and that this court could not say that the trial court was clearly and manifestly wrong in its findings. As to the claim on account of support of the child, the opinion states that defendant made a feeble effort to maintain the contention that he desired and offered to

support and provide for his daughter; but the court was of the opinion that the evidence clearly showed the contrary; that he was amply able but made no provision to support his daughter, although he knew that she had no means and must depend on someone for support; that he knew that the grandfather was providing for her; that the situation seemed in a measure understood by both plaintiff and defendant; that the greater weight of the testimony was to the effect that "the arrangement was acquiesced in by the defendant," and that under all the circumstances the court might properly find an implied promise on the part of defendant to pay for the lodging and necessary clothing of the daughter which had been furnished by the grandfather.

Upon a consideration of all the evidence in this case we arrive at the same conclusion. To begin with, the evidence shows without dispute that this father wrongfully deserted his wife and children; that he failed to provide for their support, and that by a decree of a court having jurisdiction of the marriage status, the custody of these children was taken away from him and awarded to the mother. The testimony of Dorothy was given while she was living with and was under the influence of her father. That she attempted to give a clear and truthful recital of all the circumstances, we do not doubt. She was certainly not a hostile witness and we think her evidence, taken in connection with that of the plaintiff and all the other circumstances appearing in the case, shows by a manifest preponderance of the evidence that defendant acquiesced in these children remaining with their aunt while knowing that plaintiff was expecting compensation from him for the support and maintenance furnished them. In view of the proceedings which had taken place in court and defendant's abandonment of his family, plaintiff in our opinion might well have hesitated to deliver the children into the father's custody unless assurances were

made which would have given her reason to believe that he had prepared a home where they would be taken care of, and that he had come to a state of mind in which he recognized his natural obligation to support his children. The uncontradicted testimony shows that defendant visited these children time after time while the plaintiff aunt was absent earning the means by office work performed by her in a leather goods department of a Chicago store to provide for their necessities. A careful reading of the testimony fails to show any attempt on defendant's part in good faith to regain or prove himself worthy of the custody of the children. The persons named by him as present when he demanded the children were not called as witnesses with the exception of Dorothy. Plaintiff denies his statements and is corroborated by the circumstances. We think he is liable to plaintiff in reasonable amount for the care, maintenance and education of the children, which he utterly failed to provide.

Defendant offered no evidence as to the amount which should be paid in case he was found to be liable. Plaintiff's affidavit of merits states the sum to be $1,500 and says this is due after allowing all credits, deductions, etc. Her testimony indicates a much larger amount, namely $25 a week, which would make a total sum of $1,750 due. An aunt, Amelia Williams, states that a fair, reasonable and customary charge would be "from ten up," evidently meaning $10 a week. It is apparent that the exact amount which should be paid must in the last analysis be a matter of opinion. Weighing all the evidence as to defendant's income and station in life, the kind and nature of the support and maintenance which was furnished, as well as the opinion evidence, we have come to the conclusion that $10 a week would be a fair and reasonable sum. At this rate there would be a total amount due to plaintiff of $700.

The judgment of the trial court will therefore be reversed with a finding of facts and judgment here in favor of plaintiff and against defendant for $700.

*Reversed with finding of facts and judgment here.*

O'CONNOR, P. J., concurs.

McSURELY, J., dissents.

Findings of facts: We find as facts that defendant is the father of the minor children, Dorothy and Helen Wray Norton; that from March 10, 1924, until July 15, 1925, with the knowledge, consent and acquiescence of defendant, plaintiff furnished support and maintenance in the way of necessaries, food, clothing and education to said minor children; that during all of said time defendant failed in his obligation to maintain, support and educate his said children, and that he is liable to plaintiff for the fair and reasonable value of such support, maintenance and education as was furnished by plaintiff. We further find the fair and reasonable value of said support, maintenance and education so furnished by plaintiff for said minor children to be the sum of $10 a week for 70 weeks, making a total sum of $700, for which judgment should be entered in this court against defendant, Wray S. Norton, and in favor of plaintiff, Albina Charbonneau.